**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DAVID COCROFT and** | ) | |
| **VEYNELCIA COCROFT,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **No. 10 C 3408** |
| | ) | |
| **HSBC BANK USA, N.A., as Trustee** | ) | |
| **of the Deutsche ALT-A Mortgage** | ) | |
| **Loan Trust Series 2007-OA3,** | ) | |
| **MORTGAGE ELECTRONIC** | ) | |
| **REGISTRATION SYSTEMS, INC.,** | ) | |
| **COUNTRYWIDE BANK, FSB,** | ) | |
| **BAC HOME LOANS SERVICING,** | ) | |
| **RM APPRAISAL SERVICES, INC.,** | ) | |
| **and RAY MISHAL,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

David and Veynelcia Cocroft have sued HSBC Bank USA, N.A. (HSBC);

Mortgage Electronic Registration Systems, Inc. (MERS); Countrywide Bank, FSB

(Countrywide); BAC Home Loans Servicing (BACHLS), formerly known as Countrywide

Home Loans Servicing, L.P.; RM Appraisal Services, Inc.; and Ray Mishal. The lawsuit

concerns a loan that Countywide made to the Cocrofts, secured by a mortgage on their

home. Bank of America, N.A. (BANA) is the successor in interest to Countrywide.

After the Cocrofts filed their third amended complaint, BANA, BACHLS, HSBC,

and MERS moved to dismiss the claims against them. The Court granted the motion in

part and denied it in part, leaving the following claims: a Truth in Lending Act (TILA)

1

claim against BANA, BACHLS, HSBC, and MERS (Count 1); a Real Estate Settlement Procedures Act (RESPA) claim against BANA, BACHLS, HSBC, and MERS (Count 2); a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) against BANA and HSBC (Count 5); a trespass claim against BANA, BACHLS, HSBC, and MERS (Count 8); and a quiet title claim (Count 3). *Cocroft v. HSBC Bank U.S.A., N.A.*, No. 10 C 3408, 2012 WL 1378645 (N.D. Ill. Apr. 20, 2012).

The Cocrofts never served RM Appraisal or Mishal with summons and did not seek an extension of time for service. The Court dismisses the Cocrofts' claims against those defendants (Count 4 of the third amended complaint) for want of prosecution.

BANA, BACHLS, HSBC, and MERS have now moved for summary judgment on the remaining claims against them. The Court grants the motion for the reasons stated below .

## Background

On April 17, 2007, the Cocrofts obtained a loan from Countrywide Bank, FSB in the amount of $386,750. The loan refinanced a mortgage on a home in Illinois that the Cocrofts had purchased in 2006. The mortgage instrument identified MERS as the mortgagee, "acting solely as a nominee for [Countrywide] and [its] successors and assigns." Defs.' Ex. 35 at 2. The Cocrofts allege that their note was assigned to Countrywide Home Loans, Inc., which then indorsed it in blank. 3rd Am. Compl., p. 8.

The note and mortgage were later pooled into a trust, pursuant to a Pooling and Servicing Agreement (PSA) that established HSBC as trustee. The PSA established May 1, 2007 as the cut-off date for accepting mortgage loans into the trust and May 31, 2007 as the closing date.

The Cocrofts allege that in or about June 2009, a little over two years after they obtained the loan, they learned that Countrywide had made misrepresentations in connection with the loan.  As a result, they tried to rescind the loan pursuant to TILA, mailing a rescission demand to BANA (which by then had taken over for Countrywide) and to BACHLS, which was apparently servicing the loan.  Neither of those entities took action based on the rescission demand.  On September 29, 2009, HSBC's lawyers informed the Cocrofts that HSBC would be foreclosing on the home.  The Cocrofts sent HSBC's lawyers cease and desist letters stating that the couple had rescinded the loan. Nevertheless, on January 19, 2010, HSBC brought a foreclosure action against the Cocrofts in Illinois state court.  The Cocrofts filed this suit on June 3, 2010.

**Discussion**

As stated earlier, BANA, BACHLS, HSBC, and MERS have moved for summary judgment on all of the remaining claims against them.  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "Summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events."  *Diadenko v. Folino*, ___ F.3d ___, No. 12-3091, 2013 WL 6680930, at *6 (7th Cir. Dec. 19, 2013).  "We must assume the truth of the non-moving party's evidence on summary judgment, but that duty 'does not extend to drawing inferences that are supported by only speculation or conjecture.'"  *Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013) (internal quotation marks omitted).

1.      **Admissibility of Jenkins affidavit**

The Court first addresses the Cocrofts' request to strike the affidavit of BANA

representative Lanisa Jenkins on the ground that at least some of her statements are

not based on her personal knowledge and contradict testimony that she provided during

an earlier deposition.  But Jenkins testified under oath that her statements are based on

her knowledge as a BANA employee as well as the BANA business records attached to

her affidavit, which she says she was responsible for maintaining.  As for the claim of

contradictory testimony, the Cocrofts have not identified specific inconsistencies in their

summary judgment briefs.  The Court acknowledges that the party that Jenkins

identifies in her affidavit as the holder of the Cocrofts' loan is not the same party that

she named during her deposition.  None of the Court's rulings, however, involve this

particular inconsistency.  Because the Cocrofts have not pointed to any other

inconsistencies, the Court overrules their objection to the Jenkins affidavit.

2.      **TILA claim**

TILA imposes disclosure requirements in connection with consumer credit

transactions.  "Congress passed [TILA] to improve information in credit transactions and

thus enhance the efficiency of credit markets, relying on meaningful disclosure of credit

terms so that the consumer will be able to compare more readily the various credit

terms available to achieve this goal."  *Hamm v. Ameriquest Mortg. Corp.*, 506 F.3d 525,

528 (7th Cir. 2007).  The statute requires specified items of information to be disclosed

in specified ways.  "If a lender does not disclose one such piece of information in the

specified way, leaving the borrower to make assumptions, then TILA has been violated."

*Id.* at 529.  TILA provides for actual or statutory damages in the event of a disclosure

4

violation. *See* 15 U.S.C. § 1640(a)(1) & (2). It also provides debtors with a right of rescission in certain credit transactions, "a process in which the creditor terminates its security interest and returns any payments made by the debtor in exchange for the debtor's return of all funds or property received from the creditors (usually, the loan proceeds)." *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 574 (7th Cir. 2008).

The Cocrofts allege that TILA was violated in three ways in connection with the making of the loan. They contend that the finance charges were understated, the identity of the actual lender was withheld, and they were provided with only one copy each of a Notice of the Right to Cancel (NORTC), a notice describing their rescission rights, rather than the required two copies. The Cocrofts do not appear to seek damages for these alleged violations. Rather, they rely on the disclosure violations for their impact on the right of rescission. Under TILA, a borrower who obtains a loan secured by a mortgage on his principal dwelling can rescind the loan for three days after closing or the delivery of the TILA disclosures, whichever is later. 15 U.S.C. § 1635(a); *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998). Thus in the event of an improper disclosure or failure to provide rescission forms, the period to rescind is effectively extended. Even in this situation, however, the right of rescission expires three years after the date of consummation of the transaction. 15 U.S.C. § 1635(f).

The Cocrofts attempted to exercise their right to rescind in or about July 2009, after they claim to have discovered the alleged TILA violations. They allege that the defendants did not take the necessary steps to rescind the transaction, thus rendering them liable for damages under TILA for failure to honor the right to rescind. *See* 15 U.S.C. § 1635(g). The Cocrofts also seek an order rescinding the transaction.

5

The first question is whether there was a TILA violation when the loan was made, such that the time for exercising the right to rescind was extended. The Cocrofts first argue that the finance charge was understated in the TILA disclosures. They have not, however, offered any admissible evidence of this. Their only support for this contention is a "forensic report" prepared at the request of their former counsel. The report is completely lacking an evidentiary foundation that would make it admissible. *See Marr v. Bank of Am., N.A.*, 662 F.3d 963, 966 (7th Cir. 2011) (party opposing summary judgment must "point to evidence that can be put in an admissible form at trial, and that, if believed by the fact-finder, could support judgment in his favor"). Specifically, the Cocrofts have offered no evidence regarding whether the data relied on in the report are accurate or how the figures in the report are calculated.

Next, the Cocrofts contend that the disclosures did not accurately identify the lender; they seem to contend that Countrywide Bank did not fund the loan. The evidence they offer does not support this; the fact that the loan proceeds came from an account at a bank other than Countrywide does not mean the funds were not Countrywide's funds. That aside, to support this allegation in their complaint the Cocrofts cite Regulation Z, TILA's implementing regulation, but what Regulation Z requires is disclosure of "[t]he identity of the creditor making the disclosures." 12 C.F.R. § 226.18(a). Countrywide Bank was the obligee on the promissory note and thus was "the creditor making the disclosures." The disclosure was accurate.

The Cocrofts' third and final allegation of a disclosure violation at the time of making the loan is that they were not given two copies of the NORTC, as required. *See* 12 C.F.R. § 226.23(b)(1). Defendants cite the fact that at the loan closing, the

6

Cocrofts signed a written acknowledgment that they had received two copies.

Defendants also rely on an affidavit of the closing agent, who does not recall the

particular transaction but says that her standard practice was to provide two copies.  In

response, the Cocrofts rely on the statement and testimony of David Cocroft that he did

not receive two copies and that when, much later, he looked at his file regarding the

loan, there was only one copy of the NORTC (and, inferentially at least, no one else had

access to the file in the interim).

Under *Marr*, the evidence offered by the Cocrofts is enough to give rise to a

genuine factual dispute regarding this alleged disclosure violation.  The

acknowledgment that the Cocrofts signed at the closing provides only a rebuttable

presumption of receipt of the requisite copies of the NORTC.  *See* 15 U.S.C. § 1635(c).

The presumption is overcome by a plaintiff's offer of admissible evidence from which a

jury reasonably could find that he did not receive two copies, *see* Fed. R. Evid. 301

(effect of presumption), and Mr. Cocroft's affidavit meets that requirement.  *See Marr*,

662 F.3d at 967-68.  *Marr* did not directly address whether a borrower's affidavit by itself

is enough in these circumstances to create a genuine factual dispute, but the court's

reasoning strongly indicates that it does.  *See id.* at 968 (so-called "'uncorroborated,

self-serving testimony, if based on personal knowledge or firsthand experience, may

prevent summary judgment against the non-moving party, as such testimony can be

evidence of disputed material facts'") (quoting *Montgomery v. Am. Airlines, Inc.*, 626

F.3d 382, 389 (7th Cir. 2010)); *see also Cappuccio v. Prime Capital Funding LLC*, 649

F.3d 180, 190 (7th Cir. 2011).

Because a reasonable fact finder could determine that there was a TILA

disclosure violation at the time of the closing that was not cured thereafter, the Court takes it as a given for present purposes that the Cocrofts' right to rescind extended for the full three years provided in 15 U.S.C. § 1635(f).

Defendants argue that the Cocrofts did not adequately or properly exercise their right to rescind, for three reasons: they did not tender the loan proceeds at the time they sought to rescind; they did not rescind in timely fashion because they did not file this lawsuit within three years of the loan closing; and their rescission was ineffective because they had no intention to, and could not as a practical matter, return the loan proceeds.

The first of these arguments is unavailing, as the Court concluded in denying defendants' motion to dismiss the TILA claim in the Cocrofts' third amended complaint. *See Cocroft*, 2012 WL 1378645, at *3. The analysis begins and ends with the language of the statute and the governing regulation, Regulation Z. Both make it clear that all a debtor is required to do is send a notice of rescission, which the Cocrofts did in July 2009. Specifically, TILA says that "the obligor shall have the right to rescind the transaction . . . by notifying the creditor, in accordance with regulations of the Bureau, of his intention to do so." 15 U.S.C. § 1635(a). The statute clearly and unambiguously sets forth that within twenty days after exercise of an obligor's right to rescind under section 1635(a), the creditor "shall," within twenty days, return any property (such as a down payment) provided by the obligor and "shall" take any action necessary to terminate its security interest. *Id.* § 1635(b). It is only after the creditor does this–in the words of TILA, "[u]pon the performance of the creditor's obligations under this section"– that the obligor is required to "tender the property" that the creditor previously provided.

8

*Id.* The applicable provisions of Regulation Z are worded in similar fashion. *See* 12 C.F.R. § 226.23(a)(2) & (d) (providing that the borrower may retain any amounts received from the creditor until the creditor meets its obligation to return any money or property received and take action to terminate it security interest, unless a court orders otherwise).

The Court also reaffirms its earlier decision that an obligor need not file suit to effectively exercise his right to rescind. (This is an issue here because the Cocrofts did not file suit until a bit outside TILA's three year expiration period.) Again, this is a simple matter of the text of TILA and Regulation Z. Both of these provisions, quoted above, make it clear that to exercise the right to rescind, the obligor need only send written notice. And as long as the obligor does this within the three year period, he has met the requirements of the statute and regulation. It is not the appropriate role of a court to add requirements beyond those that Congress imposed. *Accord, Sherzer v. Homestar Mortg. Servs.*, 707 F.3d 255, 258-67 (3d Cir. 2013); *Gilbert v. Residential Funding, LLC*, 678 F.3d 271, 277 (4th Cir 2012). *Contra, Keiran v. Home Capital, Inc.*, 720 F.3d 721, 728 (8th Cir. 2013); *Rosenfield v. HSBC Bank, USA*, 681 F.3d 1172, 1183 (10th Cir. 2012); *McOmie-Gray v. Bank of Am. Home Loans*, 667 F.3d 1325, 1328 (9th Cir. 2012).

The Cocrofts' rescission claim founders, however, on the last argument made by defendants. A rescission notice is ineffective if the obligor actually received all of the necessary TILA disclosures. And as the Third Circuit stated in *Sherzer*, a TILA rescission notice "may also be ineffective because it is fraudulent–if, for example, the obligor does not have the intent or the ability to return the loan proceeds that he has received from the lender." *Sherzer*, 707 F.3d at 265. *Cf. Marr*, 662 F.3d at 966

(requirement of returning loan principal "often has the practical effect of ruling out rescission, if the borrower has already used the money to cover urgent financial obligations").  In their rescission notice, the Cocrofts stated that the rescission not only canceled the security interest in the property, "but also relieve[d] the borrower of any financial liability," and authorized them to "retain the proceeds of the transaction."  Pls.' Ex. 18 at 11.  Thus they made it clear that they had no intention to return the loan proceeds.  And in any event, there is no indication that they had the ability to repay the proceeds.  The Cocrofts' last payments on the note were made by check in July and August 2008 (covering the months of May and June 2008), and even those payments were returned for insufficient funds.  *See* Defs.' LR 56.1 Stat. ¶¶ 9-10.  In short, the Cocrofts' purported rescission notice was not truly an attempt to exercise the right to rescind, but rather an attempt to keep what they had received (the loan proceeds) and, at the same time, get back everything they had given (the security interest in the property, and their payments).  *See* Pls.' Ex. 18 at 10-11.  Thus it was ineffective to exercise their right to rescind.

Finally, because the Cocrofts did not effectively exercise their right to rescind, their claim for damages based on defendants failure to honor the rescission demand fails

For these reasons, the Court need not address defendants' remaining arguments.  They are entitled to summary judgment on the Cocrofts' TILA claim.

### 3.     RESPA claim

RESPA is a consumer protection statute that regulates the real estate settlement process, including the servicing and assignment of real estate loans.  Among other

things, RESPA obligates a loan servicer to respond to a borrower's "qualified written request" (QWR) for "information relating to the servicing of [the] loan." 12 U.S.C. § 2605(e)(1)(A); *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 680 (7th Cir. 2011). The statute defines a QWR as:

> a written correspondence . . . that—(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).

The Cocrofts assert that BANA, BACHLS, HSBC, and MERS violated RESPA by failing to respond to a document they sent in November 2009 that was labeled "Debt Collector Disclosure Statement," which they say was a QWR. Defs.' Ex. 25. This document sought information regarding who was seeking to collect the debt from the Cocrofts, the account number, the amount owed, who the original creditor was, when the debt was transferred and the circumstances of the transfer, and so on.

Defendants argues that the Cocrofts' communication did not constitute a QWR because it contained no questions about the servicing of the loan. RESPA obligates a servicer to respond to a QWR only if it seeks "information relating to the servicing of the loan." 12 U.S.C. § 2605(e)(1)(A). A reasonable trier of fact could conclude, however, that the Cocrofts' communication contained questions about the servicing of the loan and thus obligated the servicer to respond, for example, the questions regarding the amount owed and the date the debt became payable.

The next question is whether the recipients of the Cocrofts' communication responded as required by RESPA. RESPA requires a mortgage loan servicer to take

one of three actions within sixty days of receiving a QWR: 1) correct the borrower's account and notify the borrower in writing of any corrections, 2) review the borrower's account and clarify in writing why the account is correct, or 3) review the borrower's account, providing any requested information or explaining why such information is unavailable. 12 U.S.C. § 2605 (e)(2)(A)-(C). The Cocrofts' communication did not identify or suggest any errors in the account; it only sought information. Thus it obligated the servicer only to provide information.

Defendants say that BACHLS sent the Cocrofts a communication dated December 18, 2009, which was within sixty days after it received the alleged QWR, specifically, a letter that enclosed a copy of the note, mortgage, and settlement statement, as well as a copy of the loan payment history. *See* Defs.' Ex. 4 (Jenkins Affid.) ¶ 32; Defs.' Ex. 27. The letter also stated that the loan had been referred to foreclosure as of September 2009. Defendants have provided a copy of the FedEx waybill showing that the letter was sent by overnight delivery to the Cocrofts on December 21, 2009. Defendants are entitled to a rebuttable presumption of delivery. *See Godfrey v. United States*, 997 F.2d 335, 338 (7th Cir. 1993) (presumption of delivery from evidence of mailing); *Gordon v. Merit Systems Protection Bd.*, 225 Fed. App'x 871, 874 (Fed. Cir. 2007) (applying presumption of delivery to a letter sent via FedEx).

The Cocrofts do not contend in their response to defendants' motion that the letter was an insufficient response to their QWR. They argue, however, that they did not receive it. *See* Pls.' Resp. to BA's Mot. for Summ. J. at 11 ("However, such alleged responses were never provided to Plaintiff [sic]."). Their support for this argument

12

consists of their sworn affidavits verifying the statement they made in their response to defendants' Local Rule 56.1 statement to the effect that they "never received the alleged 20 Day Letter."  Pls.' Resp. to Defs.' LR 56.1 Stat. ¶ 33 & Exs. 3 & 3A (affidavits).   Because the presumption of delivery is rebuttable, the Cocrofts' sworn statements are sufficient to create a genuine factual dispute on that point.

The Cocrofts cannot succeed on their RESPA claim, however, because they have offered no evidence from which a reasonable finder of fact could award damages. RESPA says that noncompliance entitles an individual to an award of actual and statutory damages.  12 U.S.C. § 2605(f)(1).  The Cocrofts do not claim any actual damages from defendants' failure to respond to the QWR.  Statutory damages under RESPA may be awarded "in the case of a pattern or practice of noncompliance with the requirements" of the statute.  *Id.* § 2605(f)(1)(B).  The Cocrofts have offered no evidence of any noncompliance beyond that alleged in their individual case; in other words, there is no evidence from which a reasonable fact finder could find a pattern or practice of noncompliance with RESPA on the part of any defendant.[1]

For these reasons, defendants are entitled to summary judgment on plaintiffs' RESPA claims.

## 4.    ICFA claim

To sustain a claim under ICFA, a plaintiff must prove that: 1) the defendant committed a deceptive act or practice, 2) the defendant intended for the plaintiff to rely

---

[1] The Cocrofts do not respond to defendants' argument that they failed to show recoverable damages other than to say, without any supporting argument, that they are seeking only statutory damages and not actual damages.  *See* Pls.' Mem. in Opp. to Defs.' Bank of America (etc.) Mot. for Summ. J. at 11.  This non-response amounts to a forfeiture of the point.

on the deception, 3) the deception happened in the course of trade or commerce, and 4) the deception proximately caused the plaintiff's injury. *See Connick v. Suzuki Motor Co.,* 174 Ill. 2d 482, 501, 675 N.E.2d 584, 593 (1996).

Some of the Cocrofts' claims under ICFA essentially duplicate their federal TILA claims. Specifically, they contend that Countrywide understated the finance charge on the loan, withheld the identity of their actual lender, and provided them only one NORTC copy each. The current defendants, however, were not involved in making the loan. One or more of them may be an assignee of the note, but:

> [a]s the Illinois Supreme Court has held, an assignee cannot be liable under the ICFA unless the assignee's participation in the deceptive lending practice was active and direct, or, for the ICFA claims based on the assignor's violations of the federal Truth in Lending Act, 15 U.S.C. § 1641(a) ("TILA"), unless the assigned documents contained TILA violations that were apparent on the face of the disclosure statement[.]

*Manufacturers & Traders Trust Co. v. Hughes*, No. 99 C 5849, 2003 WL 21780956, at *2 (N.D. Ill. Jul. 31, 2003) (citing *Jackson v. S. Holland Dodge, Inc.*, 197 Ill. 2d 39, 49, 755 N.E.2d 462, 469-70 (2001)). The Cocrofts do not contend that the alleged TILA violations were apparent on the face of the disclosures, nor could they do so, for none of them are. Thus there is no basis to impose liability on the current defendants with regard to these aspects of the Cocrofts' ICFA claim.

The Cocrofts claim several other ICFA violations as well. They contend, for example, that Countrywide misrepresented the fair market value of the property and the true terms of the loan to induce them to take the loan, to their detriment. The Cocrofts do not contend, however, that that BANA had either an active or direct role in the alleged deception. There is no basis under Illinois law for them to bypass this requirement.

14

The Cocrofts assert further that HSBC tried to deceive them regarding the identity of the true owner of their loan, by denying its interest in the loan. They refer to a November 2009 letter, sent by HSBC in response to a "cease and desist notice" from the Cocrofts, in which HSBC stated that it could not locate the Cocrofts' account with their account number, name, address, or social security number and asked for any "information that states the account is serviced by any subsidiary of HSBC." Defs.' Ex. 26. Plaintiffs have offered no evidence that this was deceptive (HSBC may have held the mortgage as trustee, but it was not servicing the loan), and given the lack of evidence, no reasonable finder of fact could find in their favor on this allegation.

For these reasons, BANA and HSBC are entitled to summary judgment on plaintiffs' ICFA claim, and the Court need address their remaining arguments concerning that claim.

**5.    Trespass claim**

The Cocrofts' trespass claim arises from actions that took place in August 2008. The property, which the Cocrofts had rented to a tenant, was vacant at the time and was a "mess," and the Cocrofts had missed several loan payments. A vendor hired by the loan servicer, Countrywide Home Loans Servicing (which later became BACHLS), changed the locks and "winterized" the property. *See* Defs.' LR 56.1 Stat. ¶¶ 45-47. On August 29, 2008, Mr. Cocroft tried to enter the home via the front door but could not enter that way because the locks had been changed. He was able to get in through the garage door. *Id.* ¶ 48.

Under Illinois law, "[a] trespass is an invasion of the interest in the exclusive possession of land, as by entry upon it." *In re Chicago Flood Litig.*, 176 Ill. 2d 179, 204,

680 N.E.2d 265, 277 (1997) (internal quotation marks omitted). "To sustain a cause of action for trespass to real property, a plaintiff must allege a wrongful interference with his actual possessory rights in the property." *Loftus v. Mingo*, 158 Ill. App. 3d 733, 744, 511 N.E.2d 203, 210 (1987).

Defendants' argument that BACHLS did not interfere with the Cocrofts' possessory rights is preposterous; its contractor changed the locks on the house! Virtually any reasonable fact finder would conclude that this was an effort to keep people out, including the Cocrofts, seeing as how they would not have had a key to the newly-installed locks. The fact that Mr. Cocroft was nonetheless able to make his way in does not make BACHLS's action any less an interference with the Cocrofts' possessory rights.

No reasonable fact finder could conclude, however, that the interference was wrongful. As defendants argue, the Cocrofts consented to this sort of entry by the mortgagee in the mortgage instrument itself. Specifically, paragraph 9 of the mortgage, entitled "Protection of Lender's Interest in the Property and Rights Under this Security Instrument," stated that if the borrowers failed to perform their obligations under the mortgage—which included making payments on the note when due—the lender was entitled to do "whatever is reasonable or appropriate to protect [its] interest in the Property" and rights under the mortgage, "including . . . securing and/or repairing the Property," a term defined to "include[ ] entering the Property to make repairs, change locks, replace or board up doors and windows," and the like. Defs.' Ex. 35 ¶ 9. This express consent on the part of the Cocrofts is sufficient to defeat a contention that the entry was wrongful.

16

For these reasons, defendants are entitled to summary judgment on the trespass claim.

### 6.    Quiet title claim

"An action to quiet title in property is an equitable proceeding in which a party seeks title to remove a cloud on his title to the property. . . .  A cloud on title is the semblance of title, either legal or equitable, appearing in some legal form but which is, in fact, unfounded or which it would be inequitable to enforce." *Gambino v. Boulevard Mortg. Corp.*, 398 Ill. App. 3d 21, 52, 922 N.E.2d 380, 410 (2009).  The Cocrofts challenge the validity of the assignment from MERS to HSBC on the ground that their loan was transferred to the trust in violation of the PSA governing the trust.  They allege in particular that the loan was transferred after the trust's closing date, May 31, 2007 and that an entity other than the "depositor," MortgageIT Securities Corp., transferred the loan.

Defendants contend that the Cocrofts lack standing to challenge the assignment in the first place.  The Illinois Appellate Court has stated that third parties generally lack standing to challenge the validity of assignments, but it also acknowledged that a variety of jurisdictions have recognized exceptions to this supposed rule.  *See Bank of Am., N.A. v. Bassman FBT, LLC*, No. 2-11-0729, 2012 IL App (2d) 110729, ¶¶ 14-17, 981 N.E.2d 1, 7-9 (2012).  To determine whether the Cocrofts have standing, the Court considers whether they have met basic standing requirements, including whether they have suffered an injury to a cognizable interest and are trying to further their own legal rights than that of a third party.  *Id.* at 6.

The Court finds that the Cocrofts meet both of the basic standing requirements.

The assignment imposes a cloud on their title, and HSBC has relied on the assignment to bring a foreclosure action against them, thereby implicating their economic interests. And so long as the assignment remains intact, the Cocrofts are at risk of liability to multiple parties on the same claim.  In this sense, by challenging the assignment from MERS to HSBC, the Cocrofts seek to advance their own interests.

As a result, the Court turns to the validity of the assignment from MERS to HSBC.  An HSBC representative has testified that MortgageIT Securities Corp. placed the Cocrofts' loan into the loan's trust on May 1, 2007, which the representative terms the closing date, but the Pooling and Servicing Agreement refers to as the cut-off date. Defs.' Ex. 32 at 20, 70.  The HSBC representative stated that she relied in part on the mortgage loan purchase agreement and the PSA.  The Court is unable to verify this based on the record.  But the only conflicting evidence that the Cocrofts have provided is the assignment, which concerns the October 8, 2009 assignment of the loan, not its transfer into the loan trust.  *See* Defs.' Ex. 36.  In short, the Cocrofts have not offered evidence that would allow a reasonable finder of fact to determine that their loan was improperly transferred into the trust.  Defendants are entitled to summary judgment on the Cocrofts' quiet title claim.

## Conclusion

All claims against RM Appraisal Services, Inc. and Ray Mishal are dismissed for want of prosecution.  The Court grants the remaining defendants' motion for summary judgment [docket nos. 180 and 183] and terminates as moot defendants' motion to compel the deposition of Veynelcia Cocroft [docket no. 172].  The Court directs the

Clerk to enter judgment in favor of all defendants and against plaintiffs.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  February 24, 2013